May it please the Court, my name is Constantine Trella. I represent the appellant Aeon. With the court's permission, I'd like to reserve five minutes for my rebuttal. This appeal involves a 32 million dollar judgment against Aeon on a claim for common law indemnification under Pennsylvania law. In entering that judgment, the district court extended state common law far beyond where the state courts had taken it. The court did so in two major respects. One by allowing a claim for indemnification for rescission, and the other respect was allowing a negligent misrepresentation claim essentially any time a misrepresentation is made in the course of business. The second point, negligent misrepresentation, you pled that there was a duty owed to RAS. Yeah, to RAS. There's no negligent misrepresentation claim that was leveled in the case. Well, Your Honor, I represent Aeon. I mean, the pleading was, and it wasn't your pleading, the pleading was not negligent misrepresentation. It was the, that there was a duty owed. Well, no, it was negligent. Negligent misrepresentation. It was negligent misrepresentation, Your Honor. Both, that was, that was the claim that was pleaded, that there was a duty to exercise due care in disclosure to RAS, and that Aeon breached that duty, which is negligence. And moreover, when the case was tried on a Section 552 restatement theory, in fact, Judge Pollack expressly said, I'm submitting this under Section 552 as the operative statement of the law. So that, that is the claim that was tried. All right. So it wasn't stated as negligent misrepresentation, but that's what it was. All right. Well, the complaint may not have used the words negligent misrepresentation, but that, that was the claim, Your Honor. You're arguing that the bootstrap to negligent misrepresentation program claim, a different kind of claim to get around the statute of limitations that... Well, that's exactly right. And I'm glad you mentioned that, because before I get into the details of how the district court extended state law, I want to make clear what this case is not about. It's not about fraud or intentional misrepresentation. Notwithstanding the rhetoric in UNG's brief, that's not its claim here. And the state law remedies for that kind of conduct are very clear and are not at issue. The other thing that's not, that's not going on here is, this case is not about whether UNG had a remedy for losses it may have suffered as a result of negligence by Aeon. It clearly did have a state law remedy. The problem is that UNG waited too long to assert that remedy, waited years too long. But it didn't have a cause of action until there was some harm or that there were damages suffered. So it wasn't until the conclusion of the arbitration that it really had a claim, did it? No, that's not, that's not correct, respectfully, Your Honor, for a couple of reasons. One is, as in fact the Fifth Circuit in the TIG case pointed out, on precisely the same facts, there is injury in fact at the time the reinsurance was in effect at that point and was subject to rescission. But we don't have to accept the Fifth Circuit's. Oh, no, of course not. You don't, Your Honor. But I'm suggesting, and we tried to make clear in our briefs, that the law that the Fifth Circuit was applying there, the Texas law in particular, is identical here. And what's the best case for that? That Pennsylvania law is identical? Well, I think the best case is the way that the Fifth Circuit described Texas indemnification law as purely vicarious liability for damages suffered by a third party. But where does Pennsylvania law cut that so close? Well, I think builder's supply, I think the Birch case both talk about indemnification is a remedy for damages that the indemnification plaintiff had to pay to a third party for injury to that third party. And which brings in another point here, Your Honor, and that is indemnification under Pennsylvania law is, although UNG tries to portray it as this equitable, expansive, broad remedy, you know, sort of a free range to do justice, that's not at all the way the Pennsylvania courts apply it. It is a remedy allowed to someone who was forced to pay, basically to compensate a third party for injury that they suffered as a result of someone else's negligence. It's not a remedy for injury that the indemnification plaintiff suffered directly as a result of that negligence. Did you object to the instruction, because the jury instruction was very broad as to losses caused? Oh, we absolutely objected, Your Honor, because we said that this claim should never have gone to the jury in the first place. We moved to dismiss on that basis. I thought at a conference you said you wavered on it and said, let me kind of get back to you on that. I don't know if there was a specific objection in the record. Maybe I'd like to see where that was. Well, Your Honor, at that point the judge, the ship had sailed. I mean, the judge had already said there is indemnification for rescission. That is allowed. And he made clear, it's at pages, among other places, 208 and 209 of the appendix, where he talks about, well, actually, that may be when he was talking about Billett-Wright. But when he denied the motion to dismiss, he said, and referring to a specific paragraph of the complaint, that what you have here is a roster of the kind of losses that I find you can recover under Pennsylvania law for indemnification. So I think the issue was very clearly preserved, Your Honor. At that point, the judge had made his position very clear. Now, what we have here is UNG was not seeking recovery for an injury to RAS that it had to make up. It was seeking recovery for its own injury. And I think that's clear among other places. If you look at page 2107 of the appendix, that's the summary damages exhibit that UNG presented to the jury. And they list, it's basically, their claim is, we had to pay our insurance, and therefore, you should pay us. Well, again, that would be a perfectly legitimate direct claim against AON if brought within the statute of limitations, but it was not. It was brought, we ended up trying a case where the relevant events had happened 15 years earlier, witnesses had died, documents had been lost, and obviously, memories had faded. So what they were allowed to do and should not have been allowed to do was to take this state law claim that's designed, again, to deal with third-party injuries and to basically turn it into an end run around the statute of limitations to pursue a direct claim against AON. It's sort of like the difference between liability insurance and collision insurance. You know, you don't recover under liability insurance for the damage to your own car. It's only for what you had to pay to the third party for the damage to theirs. You argue that Section 552 is inapplicable. Is that what you're arguing? That is what we're arguing, Your Honor. That's your basic argument. Well, there are two basic arguments. One is that you don't get indemnification for rescission at all, no matter what the underlying theory may be. And Judge Pollack held that was wrong as a matter of law. He rejected that as a matter of law, correct. And then the other, the next argument is that even if you, even if indemnification is available, it's only available if AON could have been liable to RAS directly. And UNG's theory on that was that it could have been liable under Section 552 of the Restatement for Negligent Misrepresentation. It was AON's position that in Biltright, the Pennsylvania Supreme Court did not adopt Section 552 wholesale. Section 552 says you can, that there's a cause of action for a negligent misrepresentation when misrepresentations are made in the course of one's business. What the Pennsylvania Supreme Court said in Biltright is that the claim is available against somebody who is in the business of supplying information. There's a big difference. Okay. I'm not. Go ahead. No, you go. That's not really what they said. I mean, that, and that involved an architect. And what they said was, actually what 552 says, and I think you'll agree that 552 does not have that specific language within it. That's correct. You could argue the Pennsylvania Supreme Court interpreted the language of 552 to include that language, but then you've got an architect who's not really in the business of supplying information. It's not like the gas excavation case. There, I think that's exactly right. That would support your argument. But I had trouble trying to get my mind around how an architect would be in the business of supplying information. Oh, absolutely. He's absolutely in the business of supplying information, Your Honor, because what you're getting from an architect, you're not getting anything, you know, a product. What you're getting is instructions, basically. Here's how you build this building. In Biltright, in fact, it was not even the construction plans. It was information for purposes of preparing the bid. Why are loss-risk ratios the same thing? I'm sorry. Why are loss-risk ratios the same thing? They're not the same thing, Your Honor, because that is not AON's business. That's information it supplies. We're not denying that AON supplies information, and we're not denying that AON supplies information as part of doing its job, as part of its business. But that is not AON's end product, which is what some of the Pennsylvania cases post-Biltright say is the test. Isn't the point, I mean, even looking at 552, it says false information for the guidance of others in their business transactions. I mean, in the architect's situation, the contractor's business transaction basically incorporates this information. You know, this wall will carry a 500-pound load or whatever, and it doesn't. The contractor's out. Here, I mean, maybe I'm making the argument for you. I appreciate it. But for the guidance, it was because they wanted to make a sale. Well, that's exactly right, Your Honor. AON's business... They're not hiding anybody. They're giving them sophisticated information so they get their business. That's exactly right, Your Honor. AON's business is procuring information for its customers. Certainly, like as any business does, as any product seller or service provider does, it provides information in the course of doing that. Any sophisticated seller does. Sure, you can't just stand there silently. But it's not for the guidance of the reinsurers. Quite to the contrary, AON acts as an advocate for its customer. It's negotiating against the reinsurer to try to get the lowest premium and the broadest coverage that it can. And RIS's witnesses made it perfectly clear that while certainly they appreciated the information from AON, they were not looking to AON to advise them or to guide them. This was a big professional insurance company. And they weren't going to incorporate that information. No, it's not at all like a design professional, an engineer or an architect, as in the Biltright situation, where the builder is completely dependent on that. The builder doesn't know where to start without that information. That's not at all the kind of situation we have here. And I think the Pennsylvania case is subsequent to Biltright and make that very clear. The excavation case that Judge McKee mentioned talks about, reaffirmed that Section 552 applies in only to those in the business of supplying information to others and also used the alternative term, professional information providers. And as I mentioned, the subsequent Pennsylvania cases talk about, you know, the end product, the stock and trade, that sort of thing. So UNG's claim, we say, should never have gone to the jury at all. AON is not in the business of providing information to others. It's an insurance broker. Its job is getting insurance for its customer. And that's, it gets paid. But Judge Pollack said Section 552 sets forth the parameters of a duty owed when one supplies information to others for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. Why doesn't that come up? And that's pretty loyal to the text of 552. That's what 552 says. Oh, it is loyal to the text of 552, Your Honor, but the point is the text is not the text of 552. And they made that very clear in Excavation Technologies, that what they were doing Well, I'm reading from Biltright. What I read to you was from the Biltright opinion. Right. That's correct. The Court was describing Section 552, but that's not what the Court adopted. The Court states, accordingly, and this is at page 287 of the Atlantic Second Reporter, accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional. And that is, that language, as Judge McKee pointed out, is different than the language of Section 552 itself, which talks about information provided in the course of one's business. You mean the Supreme Court of Pennsylvania took 552 broader than its actual language? No, no, no, no. Judge Slover, it made it narrower because the language of Section 552, just in the abstract, and as Judge Pollack read it, would apply to any business, a car dealer, car maker, appliance salesman, contractor, what have you, who allegedly makes a negligent misrepresentation in the course of that business. What the Pennsylvania Supreme Court did in Biltright and reaffirmed in the Excavation Technologies case is said, the Court said, negligent misrepresentation is available against one who is in the business of supplying information. And as I mentioned, the subsequent Pennsylvania cases and federal cases and this Court's decision in Azure versus Chase Bank, for example, said that the claim did not lie there because Chase Bank was not in the business of supplying information to Azure. That wasn't its business. I mean, it did supply information to them. It was in the course of Chase Bank's business, but that was not Chase Bank's product, if you will. The rest of that maybe does start up where they said that it's aimed at foreseeable the information will be used and relied upon by third persons. And you're arguing there's no third person here. Your client is, you're trying to get maybe a third person to increase their coverage and reduce the amount of their premium. But the reliance here is not on the part of the third person. The reliance is on the part of the underlying insurer. I would, I think I would say it slightly differently. It may or may not be the case that a reinsurer in the position of RAS would rely on the information. I mean, AON is providing the information to them. But the point is that it's not AON's business to be their advisor. We do advise our clients, obviously. But the end product is not advice to RAS. The end product is getting insurance for UNG. The risk loss ratios, who are those tended for? Well, those go, well, I think both UNG would, they'd be of interest to UNG, of course. But also they're of interest to the reinsurers. RAS would be primarily interested in that. RAS would be interested in the loss ratios, absolutely. But they're interested, not because they want to incorporate them in their product as their own and, you know, be guided by them. They're interested because, looking at them, they're going to decide whether they want the deal or not. Well, that's exactly right. It affects, do we want to sell this reinsurance? If we do, what's our price? What other terms? You know, look at it this way. Any sophisticated seller who advises a customer on things that the customer might not otherwise know, you'll have an exception under 552. Well, that's right. I mean, it's, you know, car dealers give you information on miles per gallon, horsepower, acceleration and all of that. And that information is important and you may well rely on it. But that doesn't mean that they're in the business of providing information or they're an advisor to you or anything like that. And that's the difference between the text of Section 552, at least as, I don't know that any court has applied it quite as broadly as it seems to be written, but that's the difference between the language of 552 and what the Supreme Court did in Biltright. Your client doesn't supply information? Our client does not supply information as its business. It supplies information in the course of providing, obtaining insurance for its customers. In the course of its business? In the course of its business. Okay. So it supplies information in the course of its business? We're not denying that it supplies information. What we are saying, Judge Sloviter, is that it is not in the business of supplying information. It's end product is not information. It's not advice. Its end product is insurance. It's like the gas company who's, in the course of the business of supplying gas, also gives information about what its lines are, but that's not what its business is. Exactly. And it's like Chase Bank in Azure. In the course of providing the credit, the loan facility there, it provided information in the course of that business. This should be a 20-minute argument at least. Was this a 20-minute argument? It is a 20-minute argument. My sheet says, I'm looking the wrong way. It is 20. Okay. On rebuttal, would you address pre-judgment? I'd be happy to, Your Honor. Interesting. Thank you. Good morning. May it please the Court. My name is Jerome Katz, and I represent the plaintiff appellee, United National, or UNJ. Your Honors, this case is about AON providing false statistics to RAS for the very purpose of enticing RAS into providing reinsurance to United National. Well, if that's what it is, why isn't it a misrepresentation lawsuit that's what it is? Your Honor, this lawsuit is an indemnification suit. So if you're asking How can you indemnify for your own losses? Because the law is clear in Pennsylvania that because, in effect, as an economic matter, United National, as a result of the arbitration, had to pay the economic equivalent of damages to RAS, we can absolutely be indemnified for it. And, in fact, Your Honor, there was a case decided by Judge Rubino, the Rubin-Quinn case, where an indemnification suit was brought before there was any lawsuit. So one of the That's a district court case, and that may be, you know, as far as it goes, but you say the law is clear. In Texas, the law is really clear. Here, I don't know if this fact pattern has really been presented and decided by Third Circuit. Judge Rendell, it has not. And the reason it has not is because the vast majority of cases that come through this court system are damages cases. Why isn't it like builder's supply? And why isn't the analysis used in builder's supply versus McCabe basically identical to that used by the Fifth Circuit under Texas law and TIG? Two reasons, Your Honor. The first of all, the facts in the TIG case, T-I-G case, were the opposite to the facts in this case. In the TIG case, the insurer, which is in the position of United National, the insurer issued insurance policies before it obtained reinsurance. It put itself at risk that it would not succeed in obtaining reinsurance, and it turned out it didn't. Here, it's the opposite. United National made it a condition with AON that it would not issue a single insurance policy unless it was assured by AON that reinsurance was in place. So the TIG decision, Your Honor, makes a big deal out of the fact that the insurance was issued. Here, the parties would not return to the status quo. It was the opposite. And I'll give you a second reason, Your Honor, why Texas is very different. It is very, very different. I think Judge McCabe's question was builder's supply. It was builder's supply. Builder's supply happened to be a damages case, and we certainly agree that, and I think everyone agrees, AON agrees, that in a damages, when the first lawsuit is a damages suit, that indemnification would lie. But the point we're making, Your Honor, and I'm going to cite some Supreme Court of Pennsylvania cases to you in a second, the point we're making is that it is utterly irrelevant what label RAS put on its arbitration demand. They chose to characterize their arbitration as one for rescission. They could just as easily suit for damages. And the result At that point in your brief, yes. Yes. And Judge Slover, the result would have been identical. And the reason it would be identical is because in Pennsylvania, the damages to someone who sues for damages is 552B of a restatement. If RAS had simply chosen to sue for damages instead of rescission, the music would have stopped in the identical place. They would have ended up not owing anything for reinsurance. And it is our position, Your Honor, that it would be legally absurd and as a matter of public policy absurd to say that everything hinges on the label they put on the case. And in fact, Judge Rubino granted district court judge. But Judge Rubino, that was a case where there was a settlement. There was never a lawsuit at all. A case was settled. A dispute, not a case. An issue was settled before there was any litigation. And Judge Rubino granted indemnification. And he didn't ask, gee, what would the name of the lawsuit have been called had there been an earlier lawsuit? Would it have been called rescission? Would it have been called damages? He didn't care. And the reason he didn't care is because the party here in RAS's situation ends up in the identical place. And this is the, this issue, this policy issue, this is a policy issue very much, Your Honors. This issue was addressed frontally by Judge Sweet up in the Southern District of New York. And he said that if the result depends upon the form, the name of the cause of action, he said it would defy common sense. And we submit, Your Honor, that it would. And we think that this Court, Judge Rendell, you asked about decisions in Pennsylvania. And it is true that the issue comes up in damages context, but there is no decision in Pennsylvania that says that an indemnification suit cannot arise following a rescission. And I think we, we should take note of some of the policy positions that we have heard from the Pennsylvania Supreme Court. In the Walton case, the Court said that indemnification has been employed to achieve equity. That's what they tell us. In the Willett case, the Pennsylvania Supreme Court said that indemnification, quote, will be recognized in cases where community opinion would consider that injustice, the responsibility should rest upon one rather than the other. And we heard, we get the same thing from the Superior Court in the Wilkes-Barre case. In the Embry case, we get the same thing from the Commonwealth Court in the Wilkes-Barre case where they say that the goal is to prevent an unjust result. And But isn't the injustice there, doesn't that turn in large part upon the doctrine of vicarious liability? It does in part, Your Honor. And I'm glad you asked that question because there absolutely is vicarious liability here. Why is there vicarious liability? My client, United National, lost the arbitration. We all agree on that. Aon was, was UNG's agent. The jury found that UNG was not negligent. You mean the arbitrators or the jury? The jury. I'm now switching. I realize, Your Honor, it's confusing because this is a case about a case. The whole thing is confusing. I understand. And it's not exactly a Hamlet either. Right. You've asked Judge McKee about vicarious liability. And great question. Why was there vicarious liability? We know there was vicarious liability because my client lost the arbitration. So how do we know there's vicarious liability? Well, we know because of case number two. Case number two is this case that gets us here today. And in this case, we know the jury, in their verdict form, answered. Was there any breach or negligence by UNG? Entirely caused by your agent. Entirely caused by the agent. Well, isn't that the very essence of vicarious liability? There was harm to us if we had to pay the economic equivalent of damages in the arbitration, which we did. Make no mistake, whether you call it damages or rescission, Raz was released from paying United National Reinsurance. That's as much damages as if money was paid over by United National. Could you address the built right issue? Because I have to tell you, I have a problem with the way Judge Pollack viewed built right and 552. Because as I read built right and 552, the architect supplies the information to the contractor who then basically incorporates that, relies upon it in his business, and if the load will not bear 500 pounds, it will bear only 300 pounds. And if the architect was not competent, if you will, it's giving a cause of action because they sold that advice. Here, and he, the contractor used that advice in his business. Here we have factors and information about risks going from Aon to Raz. And based on that information, Raz doesn't use that in its business because it's going to reinsure. That's what it does. It uses it to make the decision whether to purchase. That would open the floodgates that every time there's a sophisticated providing of information that someone relies upon in making the decision as to whether to cinch the deal. And, in fact, the complaint specifically talks about that, talks about that it's done in the transaction of relying upon it in deciding to go with UNG. I don't see how that fits with 552 and built right. Your Honor, with respect, I disagree. It fits perfectly with 552 and built right and excavation and an earlier Supreme Court case called Bortz. And it fits specifically, in fact, the comments to 552. The voice was before 552. I'm sorry. Wasn't Bortz the case that was decided before 552 was adopted and built right? So in that, so that analysis wasn't really part of that. It was, it was correct. It was adopted, it was decided before 552 was formally adopted. But Bortz says, actually, built right talks about Bortz, Judge McKee. Built right says the following about Bortz. They say that under the law of Pennsylvania, 552 can be used against anyone, by anyone, it applies to anyone, no matter what his occupation. That's what built right says. So, Judge Rendell, you asked about built right. That's one answer. With respect to this, I'm saying that built. It's not in the business. Built right says in Pennsylvania, we're adopting 552, but we're limiting it. It doesn't mean restatements don't, you know, aren't automatically adopted. We're limiting it to the person who's in the business of supplying the information. They supply the information, and the invoice comes back, we're paying for that. Your Honor, first of all, I should point out that Aon, at trial, about half a dozen times admitted that they were in the business of supplying information. The argument that you're really discussing is whether someone can only be liable under 552 if they are selling information. Am I understanding? Right. Am I understanding Your Honor's question? The Pennsylvania Supreme Court in built right expressly rejected that. How did they reject it? They rejected it because there was a case in the middle district of Pennsylvania 20 years ago in a case called Palco that said just what Your Honor is saying, it should have to be a seller of information. And built right said no, it doesn't have to be a seller of information. They rejected it. It is sufficient that the speaker is providing information. Aon could not have broke reinsurance without providing information. That's not a but for test. It's not a but for providing information. They couldn't have done it. That's not the test. No, you're right. Your complaint alleged that they were soliciting the participation of other companies to act as retrocessionaires. Your complaint is not framed that they were providing information. Well, I think we don't use the we don't say it's a but for test, but we do say they were providing information. But if you look at excavation, for example, we know that the only reason Let's go back to Palco a second. Yes. Palco was based on Illinois law, wasn't it? The Supreme Court noted that the Palco decision rested on Illinois law. Palco was applying what it believed was Pennsylvania law, and they were looking at cases in Illinois for input. But it's decided under Pennsylvania law. So what we have here is the controlling decision in Pennsylvania. This is critically important here. We have the controlling decision in Pennsylvania from the Supreme Court, which is Biltright, as enhanced by excavation. And Biltright says we're not agreeing with Palco. So we know that you don't have to be the seller of information. We know that you don't it doesn't the information doesn't have to be the end and aim. Mr. Trella used those words, end and aim, end product. Your Honors, we'll go back and look at excavation and Biltright, and you will see that those words are not there. Excavation draws the distinction between it and Biltright by saying that it's not the defendant akin to the architect in Biltright who was a professional information provider. Correct, Your Honor. It does. And it ultimately fines for the gas company. This is critical. It fines for the gas company. Right. Because the gas company wasn't getting anything out of the transaction. That's not what it said. It said the gas company was in the business of supplying gas. Correct. Correct. And Aon, I submit, Your Honors, was absolutely the epitome of a professional information provider. You said they were soliciting participation of other companies. That's what was pled in the complaint. Yes. And as part of that, Your Honor, the core function of Aon, when they are soliciting companies to purchase reinsurance, is to provide the lost statistics. That's the marketing materials. Well, it's marketing materials in the sense that they were used to try to entice Raz. Right. Exactly. But they were phony statistics. They were phony. Well, Your Honor. I mean, we're talking Biltright. We're not talking about deceit and fraud. We're talking about whether Biltright fits. I understand. And in Biltright, there was no deceit or fraud in Biltright. And the architect in Biltright was not an information seller. Sure he was. Sure he was. He said, this is what it says. It's a 500-pound load-bearing wall. It's this and this and this. Contractor does it. It's wrong. They weren't getting paid for the information, Judge. They weren't? What were they getting paid for? They provided drawings. That's interesting. They provided plans. And Aon could only consummate this transaction by providing these law statistics. You're saying there's a but-for test. I don't think Biltright says that. I don't want to argue with that. They're looking at Biltright. Apparently, what I was looking at in Parco, Parco looked to Illinois law for persuasive authority as to what Pennsylvania law was. But you're right. It wasn't based upon Illinois law. It was Pennsylvania law looking to Illinois law for the meaning of Pennsylvania law. And that's what the Supreme Court was talking about. You're correct, Your Honor. And I want to say something else about excavation. The reason why the plaintiff lost an excavation is because the gas company was required under Pennsylvania's One Call Act to provide information to contractors so they knew where gas lines were. It wasn't because they weren't selling the information. It's because they had no pecuniary interest in the transaction. They get no benefit from the transaction. In our case, Aon was receiving $5 million a year in commissions. And, in fact, there's a comment to Section 552, Comment D. Comment D specifically says that 552 applies if someone is receiving provides false information in connection with the transaction where they're receiving commissions as an agent. Well, the court in Columbia Gas case said because Columbia Gas is not in the business of providing information for pecuniary gain, 552 does not apply. It's at 843 Atlantic Second. Right. They seem to be focusing on what the business of the entity was. And the issue, the number of the issue judges, what does it mean pecuniary gain? Does it mean you have to say, here is the information, write me a check? Or does it mean that in the course of the transaction, as a result of the transaction, there is gain? Aon's gain here was enormous. And if the rule is somehow read to be that you have to be a seller of this reading of Biltright, it's a mixed reading of excavation. And I think you do have to look at Bortz because Bortz is still relevant. Biltright said it's still relevant and has to be looked to. Have I answered your question, Judge? Can you address the interest, prejudgment interest issue? Absolutely. Under Pennsylvania law, there are two paths to prejudgment interest. Judge Pollack said I'm going to take one of the paths. I don't have to address the other. If I had to, it may well apply. The path that he chose to address is the path that says that a judge has the discretion. This is a purely discretionary issue. He has the discretion to grant prejudgment interest to avoid unjust enrichment or injustice. There's a Pennsylvania Supreme Court that says this called SAC. There's a decision by this court that says it called Peterson. There's a decision, many decisions in the Eastern District and elsewhere that say it. So, Judge Rendell, it's a purely discretionary issue. The judge had the discretion. He also had a second path, and he said it may well apply, but he chose not to use it. The second path is the path that says that if the underlying dispute is about a tort and if the damages are liquidated, then he can also grant prejudgment interest. And, as you know, your honors can affirm on any basis, including one the judge didn't use, here the underlying issue was the tort of misrepresentation because that's what the arbitration was about. And the damages were indeed liquidated because they were provable and proven by UNGA trial based on accounting records that simply laid out to the dollar the amount of lost reinsurance, and that's the amount to the dollar that the jury awarded UNGA trial. Although no one knew, I mean, we say unjust enrichment. It's, you know, somebody's withholding some money. It really wasn't until, you know, the rescission was granted that anybody really knew there was a problem here. So what's, you know, why is there such an injustice here? Because, your honor, that's often going to be true, and the law does look back retrospectively. That's what trials are about. And the unjust enrichment consisted of the fact that UNG was supposed to be receiving for years and years and years reinsurance payments from RAS, and they didn't receive that money. It took years of litigation to finally get a jury to accept that. That is the money that was shelled out by my client, and Judge Pollack, we submit, had the unfettered discretion to say that in fairness, we should get unjust, we should get interest, prejudgment interest on that. Does that answer your question, Judge Rendell? Thank you. Okay. Thank you. That doesn't answer your question. You're fishing for an answer, and the answer you got was thank you. Judge, I'm happy to get a thank you. Some people in my life give me a lot worse. I'll take thank you. All right. Mr. Kess, thank you. Thank you, your honors. And Mr. Schroeder, you had a chunk of rebuttal. Thank you, your honor. Before I get to the prejudgment interest with the court's permission, I'd like to just touch on a few of the points that Mr. Katz made. One is he talked about Biltright rejecting the Palco case. It most assuredly did not reject the Palco's case's reasoning. What it rejected was Palco's conclusion that an architect or a design professional is not in the business of selling information. That was the distinction that the Supreme Court and Biltright drew, and that discussion is at pages 283 and 284 of the court's opinion in the Atlantic Reporter. But the Biltright formulation of in the business of supplying information is almost verbatim the same as the formulation in Palco. The Bortz case has no application here. Not only was it decided before Biltright, but the court in Biltright said the elements of the negligent misrepresentation tort under Bortz are different than under Section 552. They're different than what we are doing here. That's at pages 278 and 280 of the court's opinion. And Judge Pollack in this case also said, I'm not submitting this on the basis of Bortz, which requires a special relationship and all sorts of other things. I'm submitting it under 552, and they are different. That's at appendix page 2766. Mr. Katz referred to the Judge Sweet decision. That's the Prudential case in New York. That was obviously a district court case decided about 25 years ago. Judge Sweet was trying to predict New York law. He said there is no precedent for allowing indemnification for rescission in New York, but I think in fairness I should do it. The only state court case that has said anything close to that is the American Home case, which UNG had pointed out to this court in a letter after its brief was submitted. And that case, subsequent to UNG's letter, the New York Court of Appeals has taken review of that case. So whether that even reflects New York law is an open question. Now, in talking about interest, Mr. Katz said that essentially what UNG recovered was the lost reinsurance, and that really gets right back into why this is not a proper indemnification case. It did not recover for some injury that Raz suffered. It recovered supposedly for this lost reinsurance. And indemnification is an equitable remedy, but that doesn't mean there are no rules. That doesn't mean that it's just, you know, a license to do justice. The Pennsylvania courts require damages, not the economic equivalent of damages, which is a term Mr. Katz kept using. And this was – would not have been the economic equivalent of damages anyway had Raz sued for damages. First of all, it would have had a proof of fault, and then it would not have recovered back every dime. It would have recovered because when it – when it entered into the reinsurance contract, it didn't expect that it was going to pay no claims. It would have had a proof that given the information it was provided, it would have been reasonable to expect claims in a certain range, and it would be entitled presumably to recover the excess. So it would have been a very, very different case than the rescission case that it brought and won against UNG. The – Do you agree that the distinction is between those who sell information and those who just give information in the course of the business transaction? I think that's the core of the distinction. Now, that's not to say that they're – I don't think that's necessarily to say that that's the only way – what I'm thinking of is a business that – where their sole business is providing information. I mean, you might think of – That's the selling of information. The selling of information. Right. I was just double-checking to see what the court – the Pennsylvania court said, and it says Section 552 is more specific, appearing to apply on its face only to actions against those individuals who, in the course of their business profession, in which they have a pecuniary interest, supply false information for the guidance of others. They really don't make – they don't limit the application of Section 552 to those who sell information. I think they do, Your Honor, because – Oh, I don't know. I don't see it. Well, what – Specifically, what language are you referring to? I am referring to – Because I'm giving you language that doesn't say that. They say, accordingly, we hereby adopt – this is at 482 – 581PA482 – we hereby adopt 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information. That's exactly the passage. And they reaffirmed that, I think, as Judge McKee pointed out earlier, in the excavation technologies case, where they focused on the nature of the business. There's no question that that information was provided in the course of the gas company's business, but it was not their business to provide that information. That wasn't their product. Now, I promised I was going to talk about interest, so let me jump to that. Pre-judgment interest under Pennsylvania law is not – I'm sorry, Judge Slover, was it? No. I didn't see your light go on. Oh. Pre-judgment interest under Pennsylvania law is not some sort of, again, a free-ranging license to a district judge or a trial judge to do justice. It's not allowed as a matter of course in any case except contract cases. It's not unfettered discretion. The Pennsylvania courts allow pre-judgment interest or what they call delay damages where somebody is wrongfully withholding property or money that belongs to somebody else. It's not every time damages are awarded. In fact, the cases expressly say that that's not Pennsylvania law. I think Mr. Katz referred to the SAC case. That's a case where a bond was given to one daughter to hold in trust for another daughter, and she converted it, she didn't give it to that daughter, and pre-judgment interest was awarded in that case. Well, that's not a normal damages type case. It's so discretionary, and it's an abusive discretion standard. How can we say there was an abuse here? Well, I think you can say there was an abuse here because I think Judge Pollack made an error of law in concluding that this kind of a case would warrant pre-judgment interest under Pennsylvania law. This is not the kind of, you know, unjust enrichment sort of case that. Not a disgorgement. Exactly. It's not a disgorgement of property or money wrongfully withheld. It's a jury found that we were liable. Well, that's every case, and Pennsylvania does not award pre-judgment interest in cases like that. Thank you both very much for an excellent argument. We would like to see counsel. If you could just come up for a second. Excuse me. Cut the mic. We can see counsel at the bench. Yeah, if you could just come on up. Is it off? Excuse me. It's off? Yeah, we know. We know it's a cast. Take the matter into advisement. Why don't we take about a five-minute break, and then we'll go to our last case, state troopers.